HOUGHTON and another vs. BURNHAM, impleaded with others.

*City improvements: Filing of plan—What defects in notice to contractors will invalidate tax.*

1. Where the law requires a plan of a public work to be made before bids therefor are received, it is sufficient, to sustain a tax for the work, to show that the plan made was as full and perfect as it is usual for persons of competent skill to make of such works.
2. Where such plan is required to be filed in a particular office, it is sufficient that it be left there for inspection, though not marked "filed."
3. Where the exact number and size of the man-holes connected with a sewer was not defined by the notice to contractors, but the evidence shows that the expense of such man-holes is so trifling compared with that of the whole work, that this fact would not affect the bids, a tax for the work will not be held invalid on that ground.
4. Where the quality of the cement to be used in constructing a sewer was not specified in such notice, but it appeared that the best quality was in fact used: *Held*, that there is no such evidence of injustice to the tax payers as should invalidate the tax.

APPEAL from the Circuit Court for *Milwaukee* County.

Action to annul a street commissioner's certificate, a special tax assessed on plaintiffs' real estate in the city of Milwaukee for the amount named in the certificate, a sale for the amount of such tax, and the certificate of such sale; and to restrain a conveyance of the property by the city treasurer to the purchaser at such sale. The street commissioner's certificate was for work done by *Burnham* as contractor, in the construction of a sewer in front of plaintiffs' lots on Wells street in said city, under ch. 213, Laws of 1863. See *Kneeland v. The City of Milwaukee et als.*, 18 Wis., 411; *Wells v. Burnham, imp.*, 20 id., 112. The complaint avers that no plans for said sewer were made and filed in the city comptroller's office, as required by said act, before the expense of the sewer was apportioned on the lots to which it

was chargeable, nor before the making of the contract, and that the specifications filed were insufficient, and not such as the act required, in that they did not specify the number, dimensions, form, thickness of walls, materials, nor the manner or style of construction, of the man-holes mentioned therein, and did not show the grade of the proposed sewer, nor the depth of the excavation of the trench therefor. It further avers that the contract was not let to the lowest bidder, and that the notice inviting proposals for the contract was insufficient to authorize the letting thereof; that it did not state within what time the work must be finished; and that neither it nor the specifications definitely fixed the kind and quality of the cement to be used in constructing the sewer. The specifications and the notice are set out in the complaint; and the former contain the following, among other provisions: "Said sewer * * shall be laid to a grade as shown by a plan in the office of the city surveyor. Man-holes shall be made in said sewer opposite the alleys in all blocks between Second and Sixth streets;* and for the balance of the sewer at such places as the street commissioners shall direct, at distances of not less than 400 feet. * * * The cement to be used shall be the Illinois cement, manufactured at La Salle by F. Clarke, or Fayetteville water lime and Rosendale cement; and it shall be decided by the street commissioners, which shall be used. If the Illinois cement is to be used, the whole work shall be laid in it. If the street commissioners decide to use the Fayetteville and Rosendale, then the lower or bottom half shall be laid in Rosendale, and the upper half of the sewer in Fayetteville lime. * * Both brick and cement shall be of first rate quality for the purpose." The notice (dated June 5, 1863) stated that at a specified time and place, sealed proposals would be received

---

* About half the length of the sewer.

" for the construction of a sewer in the Fourth ward of the city of Milwaukee, from the west side of Twelfth street, at its intersection with Wells street in said ward, through said Wells street to the Milwaukee river, in accordance with the plans and specifications of the city surveyor, *on file in the office of the city comptroller.*"   The defendant *Burnham* filed a separate answer.

In respect to the filing of " plans " of said sewer in the office of the city comptroller, the evidence tended to show that the " city surveyor " made out a profile of Wells street from the Milwaukee river to Twelfth street, containing also a longitudinal section of the sewer, and with figures attached, showing: 1. The width, on the base line, of the several blocks along said street, measuring from the center of one cross street to the center of the next.   2. The distance from the base line to the grade line of Wells street at the center of each cross street.   3. The distance from the base line to the bottom line of the sewer at the center of each cross street.   4. The height or perpendicular diameter of the sewer at each of the same points.   This is what was referred to in the specifications as a " plan in the office of the city surveyor," showing the grade of the sewer.   The offices of the city surveyor and the city comptroller were both in the City Hall, entered by doors from the same hall about sixty feet apart.   The plan above referred to was not meant to be permanently deposited in the city comptroller's office, but the surveyor expected to have it in his office while the work was constructing, to use it in superintending such construction, and not to return it thereafter to the comptroller. Several days before the notice for proposals was published, and about the time the apportionment of the expense of said sewer was made by the street commissioners, said plan was placed in the comptroller's office, and was finally removed therefrom a week or more after the contract was let.   Dur-

ing the interval it was seen and consulted in that office by persons who thought of bidding, but it was sometimes taken by them to the surveyor's office, where they examined it in the presence of that officer. There were ten bids, and all of them but one referred to the " plans and specifications." Five of the bidders were examined as witnesses, and all testified that they examined said plan (either in the office of the comptroller or in that of the surveyor, or in both) before making their estimates; and several other persons who did not conclude to bid, gave similar testimony.

One Burke, called for the defendant, testified on his cross-examination, that the time allowed for the construction of such a sewer makes a great difference in the cost. " If a man has a longer time, he can do it cheaper; something like our Walker's Point bridge; we pay $20,000, when it could be done for $16,000, the increased price being occasioned by the requirement that it must be done within a very short time."

The facts found by the court are as follows: 1st. Before the expense of the sewer mentioned in the pleadings was apportioned upon the several lots and parcels of lots to which the same was chargeable, and before the making of the contract for said sewer, a plan therefor was made and filed in the office of the city comptroller of the city of Milwaukee. Such plan was in said comptroller's office prior to the advertisement for proposals for constructing said sewer, and was consulted by the defendant *Burnham* and other bidders, there, prior to the putting in of their bids. It showed a longitudinal section of said sewer, its length in lineal feet, the grade or elevation at which the same was to be laid, and its height and diameter throughout its entire length, its general shape, form and dimensions, its location with reference to the street in which it was to be laid, and furnished complete data as to the amount, depth and nature of the cutting,

excavation and filling to be done in the construction of said sewer. 2d. Said plan, together with the specifications in the pleadings mentioned, described and specified with reasonable and sufficient certainty all the work to be done, the manner and style in which it was to be done, and the materials to be used. I find them as full and definite as plans and specifications for such works usually are. The testimony of a large number of competent builders, masons, architects and engineers concurs in this. 3d. The number of man-holes in the sewer was limited by the specifications. They were not particularly specified as to their form and manner of construction, but their general shape and manner of construction is proved to be so well understood and known, and their expense so trifling, being in the whole in this case less than $200, that the omission in regard to them would not, as the evidence discloses, affect the amount of bids for the work. 4th. Said sewer was constructed in reference and pursuant to said plan and specifications, and in conformity therewith; and has gone into public use for the purposes for which it was built. 5th. The notice set forth in the complaint is the notice that was given inviting proposals for the construction of said sewer. There was one bid lower than the bid of the defendant *Burnham*, being eight cents per lineal foot lower, but the bidder proposing the same not having appeared to take the contract, the same was awarded to the defendant *Burnham* as the next lowest bidder; and in all, ten bids were made for said contract. 6th. The defendant *Burnham* bid for, took and performed his contract in good faith. The cost of the two kinds of cement mentioned in the specifications was substantially the same, the difference, if any, being merely trifling; and if there was any difference, the sewer was laid with the most expensive. 7th. I find as a fact, on the testimony of a large number of competent architects, engineers and stone masons, that said plan

and specifications furnished all the information to persons proposing for said sewer, that is usual in such structures, and all that was necessary to enable them to calculate with reasonable certainty its cost; and that nothing was omitted which substantially affected the cost of the work, or increased the tax therefor, or affected the justice of such tax." Upon these facts, the court held the plaintiffs not entitled to the relief sought. . Complaint dismissed. Plaintiffs appealed.

*Stark & McMullen*, for appellants, relied upon *Kneeland v. The City of Milwaukee*, 18 Wis., 411, and *Wells v. Burnham*, 20 Wis., 112; and insisted that nothing was shown to take the case out of the rules there laid down.

*Butler & Cottrill*, for respondent.

PAINE, J. We have carefully examined the evidence in this case, and think it sustains the finding of facts by the court below. This being so, an entirely different question is presented from that presented in *Kneeland v. Milwaukee*, 18 Wis., 411, or that in *Wells v. Burnham*, 20 Wis., 112, both of which cases involved the validity of the same sewer tax. In both of those cases it was a conceded fact, that no plan of the sewer was ever made, or filed in the comptroller's office, as the law authorizing the work required. But in this case it was proved that a plan was made and left in the comptroller's office, and that it was fully adequate to enable bidders to make a reasonably accurate estimate of the work, being as full and definite as such plans are usually made by competent architects and engineers. This must be held sufficient. The law, in requiring a plan, could only have intended a plan as full and perfect as it is usual for persons of competent skill to make of such works.

It is true, the cost could not be estimated with perfect accuracy without knowing the number of the man-holes, and how they were to be constructed. But it was shown

that a man-hole is a well understood thing, usually constructed in a round form, though sometimes in a square, but that there was no material difference in the expense; and that any person at all familiar with such works could estimate their cost with reasonable certainty. Their number was left somewhat uncertain, though they could not exceed one to every four hundred feet. This, of course, would prevent absolute precision in an estimate; but the witnesses testify that the matter was so trifling in importance that it would have made no difference in the bids.

So also there was an uncertainty in the kind of cement to be used. Such reservations, creating uncertainty as to the amount of work, or quality of materials, in contracts for public works which are required by law to be let to the lowest bidder, should be closely watched. They are of a dangerous tendency, and ought not to be encouraged. The danger is, that the bid may be put in upon an estimate for the highest amount of work, or for the best material, and then a less amount of work be performed, or an inferior quality of material used. But here it appears that the most expensive cement, was actually used. So that, although there might have been a wrong done to the property owners by this uncertainty in the kind of cement, if the prices were materially different, yet in fact there was none.

We are of the opinion, therefore, that the slight uncertainty in regard to the number and mode of construction of the man-holes, in view of the testimony that it would have no effect upon the bids, ought not to defeat the validity of the entire proceeding; that notwithstanding that, and the original uncertainty in regard to the cement, there was a substantial compliance with the requirements of the law, and no injustice done to the property owners.

*By the Court.*—The judgment of the circuit court is affirmed.

The appellants moved for a rehearing.

PAINE, J.    The argument of the appellants' counsel on the motion for a rehearing has not changed our views as expressed in the opinion already filed.    It is simply idle to say that this case presents the same questions that were presented in the *Kneeland case,* and other cases, involving the validity of this sewer tax.    It was, as already stated in the former opinion, an admitted fact in those cases, that no plan of the work was ever made or filed in the office of the comptroller, as the law required.

In this case it was proved that such a plan was made, and was filed in that office.    For we think there is no force in the suggestion that it was not filed because it was not so marked by that officer.    The intention of the law was that the plan should be placed in that office for the inspection of those who wished to bid.    And when so placed there, it was filed there, within the meaning of the law, and its object was fully accomplished.    It was not a paper of the kind that are usually endorsed as filed.

It was also proved by an overwhelming amount of evidence, that this plan was as full and specific as it is usual for competent engineers to make of such work.    And to say, merely because it appeared in the *Kneeland case* that some plan or profile of the work was in existence, but in another office where the law did not require it to be placed, and of the nature and character of which there was no adequate evidence, and it being an admitted fact in the pleadings that no plan had ever been made or filed in the comptroller's office, that the facts presented in that case were the same as those now presented, is to say what the record does not sustain.

The objection that there was a lower bid than *Burnham's* was not noticed before, because it seemed to us to have no weight.    The facts were, that *Burnham* got his hired man to allow a bid to be put in in his name, which was lower than

*Burnham's* own bid. Concede that *Burnham* intended to fall back upon this in case any other bid had been lower than his, and avail himself of the benefit of it through his hired man, as he probably could and would have done; all this does not alter its legal effect, nor turn it into a bid by which he was bound. The commissioners had no knowledge of the facts, and no means of inquiring into them. If they had known them, they could not have held *Burnham* bound by the Meyers bid. Nor could any judicial tribunal have held him so bound. Nor can it be held to constitute any such fraud as to invalidate or affect *Burnham's* genuine bid. It was a fictitious bid, which might, in a certain contingency, have been turned into a real one; but as the contingency did not happen, and as Meyers did not appear to comply with the offer that had been made in his name, the commissioners properly awarded the contract to *Burnham*, whose bid was the lowest genuine bid.

It is also claimed that we have overruled the decision in *Kneeland v. Furlong et al.*, 20 Wis., 437; because Justice DOWNER remarked in that case that the notice of the letting of public work " should," among other things, specify " the time within which it is to be finished." That remark is contained in the opinion; but the decision certainly did not turn upon that point. And it is material to notice the facts of that case, to understand its legitimate application. It appeared in that case by the notice actually given, that the work was required to be " commenced immediately on the execution of the contract, and *completed without delay.*" Now, in such a case as that, it is much more material that the notice should state the time, than it is in cases where there is no special reason for haste. Such was the fact in the contract for building the Walker's Point bridge, mentioned by the witness Burke in this case. A thoroughfare in a large city is obstructed by a broken bridge. It is desired to have

it repaired at the earliest possible moment. Time in such case is of the essence of the contract. The intention is to limit it in the strictest manner in the contract. It is very important, therefore, in such case, that the time should be stated in the notice. Bidders could not otherwise know whether they would be able to fulfill the terms. But in cases where there is no occasion for special haste—where it is not intended to limit the time, but to leave the party ample and reasonable time to finish the work, it cannot be held essential that the notice should specify the time. Because it certainly cannot be absolutely essential to the validity of the contract that any limitation as to time should be expressed. It may, undoubtedly, be left to the implication of the law, that, in the absence of any express stipulation, the party shall be bound to fulfill within a reasonable time. And if it be not absolutely essential to limit the time in the contract, it cannot be absolutely essential to state that it will be limited, in the notice. It is not clear that even in the Furlong case, the contract would have been held void if the failure of the notice to specify the time of completion had been the only objection. But whether it would or not, we do not consider such a rule applicable to this case, where the time of completion was certainly not of the essence of the contract, and where there was no intention to make any short limitation.

The fact that persons who have incautiously relied on the former cases, as settling finally the law concerning this tax, may suffer hardships, we regret; but it has no bearing upon the legal question. It has not resulted from any change of decision, for we have made none. We have only held that a decision made upon one state of facts is not applicable to a new and entirely different state of facts.

*By the Court.*—The motion for a rehearing is denied.